STEVEN G. KALAR
Federal Public Defender
Northern District of California
SOPHIA WHITING
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:	(415) 436-7700
Facsimile:	(415) 436-7706
Email:	Sophia_Whiting@fd.org

Counsel for Defendant Alonzo

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 20–298 MMC |
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM** |
| v. | |
| MANUEL ALONZO | |
| Defendant. | |

### INTRODUCTION

Manuel Alonzo[1] promptly accepted responsibility for possessing drugs for sale, as well as for his personal use, by entering a pre-indictment plea agreement with the government. Mr. Alonzo first came to the United States alone when he was just 11 years old, and has spent much of his life since then trying to make ends meet. While living on the street, he participated in low-level drug sales to support his own drug addiction and to send money to his children in Honduras. U.S. Probation agrees that a downward variance from the guidelines range of 21 to 27 months is appropriate in light of Mr.

---

[1] The defendant has clarified that his full and accurate name is Enmanuel Alonso Aguilar Zuniga. For consistency with the other documents already filed, he will be referred to as Mr. Alonzo throughout this memorandum.

Alonzo's difficult upbringing, his addiction to narcotics, the fact that his longest prior custodial sentence was 60 days, and his inevitable deportation to Honduras. Presentence Investigation Report (PSR) ¶ 71. While U.S. Probation recommends 15 months of custody, Mr. Alonzo respectfully believes a sentence of time served (effectively 5.5 months) is sufficient but not greater than necessary in light of the mitigating factors, especially given custodial conditions during the COVID-19 pandemic.

## BACKGROUND

Manuel Alonzo was born on July 20, 1988, in a small village in Francisco Morazán, Honduras. PSR ¶ 38. Mr. Alonzo grew up without a father. PSR ¶ 39. For a few years in his childhood, Mr. Alonzo's mother was in a relationship with a man who helped the support the family. *Id*. However, when that relationship ended, Mr. Alonzo became responsible for financially providing for the family. *See* PSR ¶ 40. Still a child, Mr. Alonzo left his home to travel alone to the United States in search of work. *See id*. **Mr Alonzo was just 11 years old.** *Id*. Instead of finishing seventh grade, Mr. Alonzo made the arduous journey to the United States as an unaccompanied child. *See id*. Mr. Alonzo has been taking care of himself ever since. PSR ¶ 41.

Mr. Alonzo has had to protect himself since he was just a little boy. He also struggled with substance use disorder from a young age. PSR ¶ 47. He first drank alcohol when he was just 10 years old, and was first exposed to drugs when he was 11, using various serious narcotics throughout his his teen years and until the instant arrest. *Id*. Considering the tremendous trauma and obstacles of a child living alone, mostly transient, in a foreign country, Mr. Alonzo has largely avoided run-ins with the law. In 2007, when he was 18 years old, Mr. Alonzo received his only prior conviction involving drug sales, for selling $20 worth of cocaine to an undercover officer. PSR ¶ 27. His other two convictions—the only convictions that count for criminal history points—were for *misdemeanor* illegal entry, purely immigration offenses. PSR ¶ 28, 29. In two decades since first arriving to the United States as a child, the longest Mr. Alonzo has ever previously spent in custody is 60 days. *See id*. He has already spent nearly three times that amount in custody for the instant offense.

On April 14, 2020, police stopped Mr. Alonzo because he fit a suspect description. PSR ¶ 7. The officers grabbed and tackled Mr. Alonzo to the ground after an officer told him—in English,

which Mr. Alonzo does not speak—to take his hands out of his pocket. *See* PSR ¶ 7. A folding knife and drugs fell out of his pocket. *Id*. He then spoke cooperatively with a Spanish-speaking officer, as described in the police report. Mr. Alonzo explained to the officer that a man was following him and recording him. When Mr. Alonzo turned around and went to ask the man why he was following him, the man ran away. Mr. Alonzo explained he had his folding knife in his hand because he was scared of the man following him. Mr. Alonzo was not convicted of any offense involving this interaction. Mr. Alonzo has never been convicted of a violent offense. *See* PSR ¶ 27-29.

      Mr. Alonzo is being sentenced for the offense of possession with intent to distribute methamphetamine, for the drugs found on him by police. As reflected in the plea agreement, and as he explained to the officer at the scene, he intended to both personally use and sell these narcotics. *See* PSR ¶ 8. He also admits to possessing the folding knife, which he always keeps in his pocket, since he lives on the street and has no access to a kitchen or appliances. This case was dismissed in state court, but since Mr. Alonzo happened to be arrested after the government began their Federal Initiative for the Tenderloin ("FIT"), he was arrested on federal charges on May 20, 2020. *See* PSR ¶ 4. Since then, he has been in custody at Santa Rita Jail, without any access to drug treatment, since all programming has been suspended in light of the COVID-19 pandemic. During his time in custody, he fortunately has maintained regular contact with his children in Honduras. He expects to be deported to Honduras upon finishing his sentence, and has plans to stay there. Although finding reliable work is difficult in Honduras, he will not risk returning to the U.S. again given his most recent experience. In Honduras, at least he can find some legitimate work cutting timber and selling crops, he has a home, he is not surrounded by drugs, he does not risk incarceration, and he gets to live with his children.

## DISCUSSION

**I.    The Sentencing Guidelines (18 U.S.C. § 3553(a)(4))**

      Pursuant to the plea agreement, Mr. Alonzo agrees to Base Offense Level 16 as a reasonable approximation of the net weight of the drugs, based on field-testing by police and gross approximated weights. PSR ¶ 9. Laboratory analysis was not provided by the government. PSR ¶ 10.

      Mr. Alonzo also agrees that a 2-point increase applies for possessing the folding knife under

USSG § 2D1.1(b)(1), even though he did *not* possess the knife for the purpose of selling drugs. He agrees to the increase because, "in applying § 2D1.1(b)(1) the court need not find a *connection* between the firearm and the offense. If it finds that the defendant *possessed* the weapon during the commission of the offense, the enhancement is appropriate." *United States v. Restrepo,* 884 F.2d 1294, 1296 (9th Cir.1989). He in fact possessed this common folding knife because he lived on the street and did not have access to appliances regularly found in a home.

Mr. Alonzo therefore agrees with the government and U.S. Probation that the applicable U.S. Sentencing Guideline range is 21 to 27 months, after acceptance of responsibility, based upon Offense Level 15 and Criminal History Category II. Mr. Alonzo does note that his Criminal History Category is based on *misdemeanor* immigration offenses.

Although the Court must remain mindful of the Sentencing Guidelines recommendation, the advisory Guideline range is not presumptively reasonable and it cannot be given any more or less weight than any other factor listed in section 3553(a). *United States v. Autery*, 555 F.3d 864, 872 (9th Cir. 2009); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The court's paramount concern must be to "'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *Carty*, 520 F.3d at 991. A sentence of time served, followed by three years of supervised release, best aligns with the goals and factors of section 3553(a) for the following reasons.

II.   **The Nature and Circumstances of the Offense and Mr. Alonzo's History Warrant a Downward Departure (18 U.S.C. § 3553(a)(1))**

As detailed in the Background section above, the circumstances surrounding the offense and the characteristics of Mr. Alonzo's difficult background counsel a downward variance from the advisory range. *See* 18 U.S.C. § 3553(a)(1). He came to this country alone as a child, when he should have still been in the care of his family. Since then, he has had to take care of himself and has often lived on the street. Mr. Alonzo has suffered significant childhood trauma, and he had to learn from an early age to support and protect himself. He was also exposed to drugs at an incredibly young age,

and has suffered a substance abuse disorder since then. Even after all of this trauma, his past offenses are limited to one very remote drug conviction and two misdemeanor immigration offenses. If not for Mr. Alonzo's inevitable deportation, he would be an ideal candidate for a combination of mental health and drug counseling rather than excessive imprisonment. He was just beginning to get the opportunity to receive drug treatment in state court when he was arrested federally.

Despite Mr. Alonzo's trauma, limited education, addiction, and lack of support in this country, he has previously managed to find gainful employment. *See* PSR ¶ 49. This is why his criminal history is so limited and his prior drug conviction so remote. However, at the time of the offense, the country was suffering the effects of the COVID-19 pandemic. He himself became a victim of the virus, at one point becoming so deliriously ill that he threw himself into the bay and required hospitalization. PSR ¶ 45. Finding gainful employment, which was previously difficult for someone in Mr. Alonzo's position, became impossible. He was living on the streets of San Francisco, without a job, while still trying to support his children in Honduras. His worsening drug abuse and financial circumstances led to his terrible mistake in this case. He relates these circumstances not to minimize his conduct, but to provide context for it. Most importantly, he has a plan to avoid these circumstances in the future, when he is deported to Honduras and can reunite with his family. While he has returned to the United States in the past, he will not do so this time, as he has never wants to go through the combination of homelessness, illness, addiction, and incarceration that he has experienced over the past year.

### III. A Downward Departure is Appropriate to Reflect the Severity of the Offense (18 U.S.C. § 3553(a)(2)(A))

Furthermore, a downward departure is warranted because this is a less serious offense compared with other federal crimes. *See* 18 U.S.C. § 3553(a)(2)(A). While Mr. Alonzo takes responsibility for his criminal conduct in the instant offense and recognizes that selling any amount of drugs negatively impacts public health, the scope of his offense should be viewed in relation to other federal cases. The fact is that street-level drug sales are a minor offense compared to the vast majority of federal prosecutions, including drug prosecutions. If not for the FIT initiative, this offense would not be prosecuted in federal court. To the contrary, federal drug cases normally present more serious

facts, such as substantially larger quantities of controlled substances or an organized drug trafficking operation. In comparison, the offense in Mr. Alonzo's case is relatively minor.

Mr. Alonzo's guidelines are largely enhanced based on the quantity of drugs found on him, despite being street-level amounts. Because of the drug conversion for crack cocaine and methamphetamine, even relatively small amounts quickly increase the guidelines range. At this low level of drug dealing, the amount of drugs found on a defendant is not indicative of culpability, and can in fact have an inverse relationship. Experienced sellers minimize the quantity of narcotics in their possession, to avoid more severe charges and longer sentences. Experienced sellers may work in coordination with others and may use a "holder" to store the bulk of their product. Mr. Alonzo, on the other hand, was himself a drug user who worked alone on the street and only sold enough to survive. While Mr. Alonzo acknowledges that he also possessed a folding knife and should have been more conscientious about the way he handled the knife, a sentence of nearly six months takes this into consideration. The guidelines range does not accurately reflect the very low level of drug dealing at issue here; therefore, a downward variance is appropriate.

### IV. A Sentence of Time Served Affords Adequate Deterrence and Mr. Alonzo's Inevitable Deportation Minimizes Public Safety Concerns (18 U.S.C. §§ 3553(a)(2)(B) and (C))

Mr. Alonzo also respectfully contends that a sentence of time served, given his difficult time in custody and inevitable deportation, provides sufficient deterrence and public protection.

The nearly six months Mr. Alonzo has spent at Santa Rita Jail during the pandemic have been harrowing. He spent most of his first three months under quarantine, which meant counsel could not schedule meetings with him to discuss his case, he had no access to programming or recreational spaces, and he lived in constant fear of again catching the virus. While Mr. Alonzo reports that he suffered a terrible bout of COVID-19 before his incarceration, he is not necessarily immune from re-infection.[2] As this Court recently observed, "the scientific community has not, as of this date, determined whether a prior infection produces immunity or affects the severity of any potential

---

[2] Notably, at FCI Terminal Island an inmate died over two weeks after the Bureau of Prisons (BOP) determined he was officially "recovered."  *See* Richard Winton, "Inmate labeled as 'recovered' from coronavirus dies at Terminal Island," L.A. Times, May 28, 2020, *at* https://www.latimes.com/california/story/2020-05-28/ninth-inmate-dies-coronavirus-terminal-island-prison.

DEFENDANT'S SENTENCING MEMORANDUM
*ALONZO*, CR 20–298 MMC

subsequent infection." *See also United States v. Schaffer*, No. 13-cr-0020 MMC, ECF No. 40 at 2 (June 24, 2020). Indeed, the Centers for Disease Control and Prevention (CDC) warns: "We do not know the degree to which previous COVID-19 illness protects against a subsequent SARS-CoV-2 infection or for how long persons are protected."[3] Given the increased infection and death rate for COVID-19 among prisoners,[4] Mr. Alonzo understandably remains concerned for his health. Even if the Court were to sentence Mr. Alonzo to time served, he is almost certain to be transferred to the custody of immigration authorities for weeks to months prior to removal. The longer Mr. Alonzo remains in custody, the greater the risk to his health.

Relatedly, conditions in the jail are much worse than usual. Most units have dozens of inmates living together, with two inmates to a cell. Access to personal hygiene items is limited with only those inmates that have certain means able to purchase commissary. While the jail has provided each inmate with a mask and one additional bar of soap, the existing protective measures are hardly enough to protect the population, as the ongoing outbreaks have now clearly demonstrated. Additionally, the Sheriff has restricted all visits to the jail. Programming at the jail has been discontinued.[5] Inmates are extremely anxious, and many are trying to stay holed up in their cells to avoid contact. Mr. Alonzo has been quarantined for a total of multiple weeks, and is very worried about himself and his family in Honduras.

Transfers from Santa Rita Jail to BOP facilities are also limited and subject to a case-by-case determination. Thus, depending on the length of the sentence Mr. Alonzo receives, he may have to spend all of it at Santa Rita Jail. Under ordinary conditions, the jail has less space, worse facilities, fewer programming options, and less access to medical care than BOP facilities. Even if Mr. Alonzo is transferred to BOP, current conditions in prison facilities are also very grim.

In sum, this is an exceptionally difficult and dangerous time to serve a sentence. Time served

---

[3] Centers for Disease Control, Coronavirus Disease 2019, *at* https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html.

[4] *See, e.g,* Brendan Saloner, et al., *COVID-19 Cases and Deaths in Federal and State Prisons*, Journal of the American Medical Association, Pub. Online July 8, 2020, *at* https://jamanetwork.com/journals/jama/fullarticle/2768249.

[5] Alameda County Sheriff, Santa Rita Jail COVID-19 Outbreak Control Plan (October 28, 2020), *at* https://alamedacountysheriff.org/files/COVIDPlan07302020.pdf.

now is much harder than time served under normal circumstances and conditions are not likely to change anytime soon. Thus, Mr. Alonzo makes the request for a time served sentence in consideration of the fact that it is a much harsher sanction than under normal circumstances.

This is also already—by far—the longest sentence Mr. Alonzo has ever served. Furthermore, the inevitability of his deportation makes the deterrent effect of 5.5 months of incarceration that much stronger in this case. Mr. Alonzo's detention and removal from the United States following his release from federal imprisonment, and his plan to stay in Honduras, minimize any potential concerns for public safety. Unlike a similarly situated citizen defendant, Mr. Alonzo will not return to the local community following completion of his sentence. He will be quite literally removed from the community. He knows he would face steep penalties if he were to return, including supervised release violations, 18 U.S.C. 1326 charges, and federal charges for any new offense conduct. He will not return.

**V.    A Sentence of Time Served is Appropriate Given the Sentences Available (18 U.S.C. § 3553(a)(3))**

The Court is well aware of the number of analogous cases sentenced to time served in this district. The following five cases are a sampling of those involving *greater* types and quantities of narcotics, where the Court determined that a sentence of time served—or diversion—was warranted. The government's position has not been consistent, although the resulting sentences largely have.

- *United States v. Damien Galeas-Raudales*, CR 19-660 EMC: Mr. Galeas-Raudales had *five* arrests for drug sales in the Tenderloin over a period of 18 months, including one conviction for which he was on supervision at the time of the federal offense. The base offense level was 18 based on the type and quantity of drugs, and the government requested a sentence of 24 months. He was sentenced to credit for time served (effectively 3.5 months).
- *United States v. Seth Carus*, CR 19-305 RS: Mr. Carus, a U.S. citizen, pled guilty to possessing for distribution 39.5 grams gross of fentanyl, 22.4 grams gross of crack cocaine, 7.7 grams gross of methamphetamine, and 20.6 grams gross of heroin. The government's position was that the base offense level was 24, but left the issue open for

argument. The government nonetheless agreed to *diversion*. Mr. Carus had previously received diversion in state court for a controlled substance offense. Mr. Carus is not expected to serve any time in custody and the case will be dismissed, provided he completes his one-year term of diversion. He will, of course, not be deported.

- *United States v. Pedro Josiel Martinez-Elvir*, CR 19-545 SI: The government argued, and the PSR concluded, that the appropriate total offense level was 24 based on the quantity and types of substances possessed by Mr. Martinez-Elvir, including fentanyl, methamphetamine, cocaine base, and heroin, for a sentencing range of 37-46 months. The government recommended 37 months. Mr. Martinez-Elvir was sentenced to time served (effectively four months).

- *United States v. Ristir Trejo*, CR 19-535 RS: The government showed that Mr. Trejo possessed or distributed a total of 41 plastic baggies of fentanyl, 57 baggies and knotted plastic wrap pieces of heroin, 15 bags of cocaine base, and 1 plastic bag of methamphetamine, for a base offense level of 18. His criminal history category was II, and he had a warrant pending and multiple prior arrests for distribution at the time of his arrests. He was charged federally for four separate arrests over a 15-month period. He was sentenced to time served (effectively 6.5 months).

- *United States v. Arnulfo Estrada*, CR 19-546 CRB: Mr. Estrada was convicted of possessing for distribution 95 bindles of cocaine base, 21 bindles of methamphetamine, and 18 bindles of heroin. The arrest was the first of two in the same month, and he had a prior conviction for illegal entry. Mr. Estrada was sentenced to credit for time served (effectively 3.5 months).

In all of these cases, the conduct is indisputably hand-to-hand street sales to support incredibly difficult circumstances. None of these individuals is anything close to a drug kingpin, yet they are charged with federal felonies and face deportation. Except for Mr. Carus—a white U.S. citizen—they were never afforded the opportunity to participate in diversion programs or any of the other rehabilitative options available in state court. Mr. Alonzo acknowledges that he also possessed a knife, which is why he has agreed to a normal sentencing timeline rather than attempt to rush to

sentencing and ask for a less significant time-served sentence (for example, he has intentionally not requested a sentence of just two or three months). These sentences were also pre-pandemic, and did not take into consideration the specifically "hard" time that Mr. Alonzo has served.

### VI. A Sentence of Time Served Is Cost-Effective, Considering Mr. Alonzo's Inevitable Deportation.

Given Mr. Alonzo's inevitable deportation, a downward variance to time served will save taxpayers' dollars without threatening public safety, *see supra* Section IV. *See United States v. Loaiza-Sanchez*, 622 F.3d 939, 942 (8th Cir. 2010) (Bright, J., dissenting) ("[L]ong sentences for illegal aliens punish not only the defendant but the American taxpayer. 'It would be more sensible to give . . . a stiff, but shorter sentence and then to promptly deport him . . ..'" (quoting *United States v. Chavez*, 230 F.3d 1089, 1092 (8th Cir. 2000) (Bright, J., concurring))); *United States v. Maldonado*, 242 F.3d 1, 2 (1st Cir. 2001) (referencing a statement by the district court that "the real reason I'm going to depart downward here is because I don't want the taxpayers to pay for him unnecessarily"). Cost-effectiveness during the federal government's FIT campaign and the pandemic is especially important, in light of the accompanying increased rates of defendants and costs of detention.

### CONCLUSION

For the aforementioned reasons, Mr. Alonzo respectfully requests the Court sentence him to time served (5.5 months) and three years of supervised released.

Dated:   October 28, 2020                                  Respectfully submitted,

                                                           STEVEN G. KALAR
                                                           Federal Public Defender
                                                           Northern District of California

                                                                   /S
                                                           SOPHIA WHITING
                                                           Assistant Federal Public Defender